IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Debra L. Baker, | Case No. 3:05 CV 7315 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| City of Toledo, Ohio, | |
| Defendant. | |

Plaintiff is a Patrol Officer with the City of Toledo. She claims gender discrimination under Title VII of the Civil Rights Act of 1964, as amended and the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.* (Title VII) and Ohio Rev. Code § 4112.02(A), "associational disability" discrimination under Ohio Rev. Code § 4112.02(A), and "harassment and retaliation" under Ohio Rev. Code § 4112.02(I). In July 2005, Plaintiff filed a Complaint in the Court of Common Pleas, Lucas County, Ohio. Defendant removed the case to this Court. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. No. 25).

## FACTS

Plaintiff has a seriously disabled adult daughter who needs significant care. In 1990, Defendant required all new hires to move within the city limits within six months of being hired (Baker Dep. II 5). This requirement could be waived, however, with approval from the Mayor's office (Mason Dep. 101). Plaintiff requested the requirement be waived in her case, in part, because of her daughter's special education needs (Baker Dep. II 6, Ex. K). She felt a more appropriate school setting would be

found outside city limits (*id.*). Her request was granted (*id.* at 6). Since at least 1993, Plaintiff preferred specific shifts to enable her to care for her daughter. In 1993, she needed midnight shifts but did not get them in the "bid system." The bid system places patrol officers into assigned shifts for the following year according to seniority and preference (Diggs Dep. 19). Because she lost her bid for the midnight shift, Plaintiff requested a hardship accommodation in 1993 and was given a one month change of assignment due to hardship. After the one month hardship expired, she was able to switch shifts with another officer for the remainder of 1993, and remained on the midnight shift.

From 1993 until 2001, she was successful in bidding for midnight shifts. In 2002[1] her daughter's needs changed so that Plaintiff required a day shift. In 2002 and 2003, she successfully bid for day shifts, but in 2004 her bid for a day shift was unsuccessful. She requested a hardship in 2004, and Deputy Chief Derrick Diggs granted her three months on the day shift, despite the objections of her Captain, Mark Mason.[2] Captain Mason believed Plaintiff had abused sick leave and light duty in the past, and that she had already received enough time to secure child care (Mason Dep. Ex. 22). Plaintiff requested her three-month accommodation be extended so she could remain on the day shift for the remainder of 2004. When that request was denied, she informed Deputy Chief Diggs that if she was not allowed to continue working the day shift, when she returned to the midnight shift she would call in sick every shift. Her request for an extension was still denied.

In addition to Plaintiff, two other patrol officers were given a change of assignment for three months due to hardships in January 2004. One of the other officers, Bill White, continued for an

---

[1] In 2002, she also asked for an accommodation of shift start time but was refused.

[2] Her husband is also a patrol officer, and her childcare problems were exacerbated because neither she nor her husband successfully bid for a day shift.

2

additional (fourth) month on hardship, but this was due to Defendant's clerical error or miscommunication rather than an intentional extension (Diggs Dep. 12).[3]

At the end of the three-month hardship, Plaintiff returned to the midnight shift and requested that she and her husband be placed on different "key schedules" to allow each to work alternate two days, and then the two days they both were scheduled to work she would call in sick. Captain Mason required their request to be in writing and, after they complied, he granted their request for different key schedules.

Shortly after Plaintiff returned to the midnight shift in March 2004, she and her husband also began their bid for an open day shift position in the Domestic Violence Unit. While their bids were pending, Plaintiff tried to discuss her extension request with the Police Chief and she was told by a lieutenant that the Chief had already handled the matter and to stop leaving him phone messages regarding it.

Plaintiff then filed an Equal Employment Opportunity Commission (EEOC) claim on April 1, 2004. That same day, Captain Mason filed his evaluation regarding her fitness for the Domestic Violence Unit position (Mason Dep. Ex. R). His evaluation stated that he believed her ratings by her immediate supervisors were inflated above her actual performance level. He also said her "attitude and dedication are less than satisfactory" and that she was more interested in the Domestic Violence Unit's schedule rather than the actual position. However, his evaluation did not affect her application as she still received five out of five points awarded based on supervisors' evaluations. In the end, neither

---

[3] In fact, the entire hardship program was terminated on March 31, 2004 by Deputy Chief Diggs, due to its impact on staffing, potential conflicts with the patrol officers' contracts, and because it fostered discontent among patrol officers (Diggs Dep. 6-7).

3

Plaintiff nor her husband were successful in their bids because neither was the most qualified applicant, ranking seventh and eleventh respectively out of thirteen applicants.

In addition to receiving a bad evaluation from Captain Mason, Plaintiff claims he has been harassing her since 1989 (Baker Dep. I 89-90) and cites numerous incidents, including: apologizing to another officer for having to assign Plaintiff to work with him (*id.* at 102); asking her to iron and hang an American flag at the station (Baker Dep. II 13-14); asking her to do some shopping for the station (*id.*); inviting her to participate in a police department eating contest and when she refused he called her fat (*id.* at 15); cornering her and calling her weak (Baker Dep. I 102); refusing to help her seek a hardship accommodation (Baker Dep. II 17); commenting that Plaintiff was a good looking woman and that she should have no problem finding someone to get her pregnant (*id.* at 19); commenting that she "looked like shit" on New Year's Day (*id.*); telling her not to justify using curse words while on duty just because she was stressed out over her hardship request (*id.* at 20-21); referring to male patrol officers as "real policemen" (Lopinski Dep. 21); and commenting to another officer that Plaintiff should not get time off or light duty just because she had a "boob job" (*id.* at 15). Plaintiff also alleges that other officers spoke to her harshly, swore at her, and that she was sent home to remove her nail polish.

Plaintiff also complains she was denied training opportunities because of her gender. Defendant offers free, non-mandatory, training sessions for patrol officers through its Academy (Mason Dep. 44). To be approved for these training sessions, the patrol officer submits an application to the Captain for approval. Approval depends on the nature of the course and the shift scheduling. If a shift was short of patrol officers during the time of the training session, training would be approved only on the officer's own time (*id.* at 46; Lopinski Dep. 30). After the Captain's approval, the application is

4

forwarded to the Academy (Mason Dep. 44-45), which accepts a limited number of approved applications as determined by class size and other factors (*id.* at 45).

Plaintiff alleges she was denied the opportunity to attend two specific courses. In November 2003, Plaintiff applied to attend a "Grant Writing Workshop" but was denied by the Academy because her application did not have her commander's approval (Baker Dep. II Ex. N). Plaintiff mistakenly submitted the application to the Academy rather than to her Captain (Mason Dep. 49). In September 2004, Plaintiff asked permission to attend a one day "Emotional Survival for Law Enforcement Officers," offered on two days in October (Baker Dep. II Ex. M). Plaintiff's request was granted and she was allowed to register for either day, as long as she attended on her own time (*id.*).

## ALLEGATIONS

Plaintiff sets forth four claims: (1) gender discrimination in violation of Title VII, (2) gender discrimination in violation of Ohio Rev. Code § 4112.02(A); (3) associational disability in violation of Ohio Rev. Code § 4112.02(A); and (4) retaliation in violation of Ohio Rev. Code § 4112.02(I).

## GENDER DISCRIMINATION

Plaintiff claims Defendant denied, and continues to deny, her a permanent change shift assignment because of her gender. To support her claim, she asserts (1) other male employees have been allowed changes in shift assignments because of hardships, and (2) alleged incidents of harassment, when considered together, are sufficient to show an adverse employment action.

The elements of a gender discrimination claim under Title VII and Ohio Rev. Code § 4112.02(A) are the same. *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St. 3d 169, 175 (2000) ("federal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of R.C. Chapter 4112"). In order to establish a prima facie claim, Plaintiff may introduce direct or

5

circumstantial evidence of discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Because neither party suggests that direct evidence has been presented in this case, the Court will focus on whether Plaintiff has established an inference of discrimination through circumstantial evidence.

Circumstantial evidence can be used to raise an inference of discrimination by applying the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). A prima facie case of discrimination exists if Plaintiff can show she: (1) is a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the position; and (4) was replaced by a person outside the class, or was treated differently than similarly-situated, non-protected employees. *DiCarlo*, 358 F.3d at 415.

If Plaintiff can establish a prima facie case of discrimination, Defendant must articulate some legitimate, nondiscriminatory reason for Defendant's action. *Id.* at 414. If Defendant satisfies this burden, Plaintiff must prove Defendant's reason was a pretext for discrimination. *Id.* at 414-15. Pretext can be established by showing Defendant's reason: (1) had no basis in fact; (2) did not actually motivate Defendant's actions; or (3) was insufficient to warrant the actions. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

**Adverse Employment Action**

Plaintiff fails to establish a prima facie case of discrimination. Specifically, Plaintiff fails to establish that any of Defendant's actions qualify as adverse employment actions. An adverse employment action is a materially adverse change in the terms or conditions of employment, such as termination, demotion with decreased wages, loss of salary, or loss of benefits. Plaintiff alleges four adverse employment actions: (1) denial of a hardship accommodation; (2) denial of training; (3) a negative evaluation; and (4) a long period of harassment.

Plaintiff claims the denial of a hardship accommodation was an adverse employment action because being on the midnight shift forced her to use sick days for the care of her child. The use of sick days in turn caused her to lose wages, which Plaintiff claims is crucial to the adverse action analysis. While the loss of income is an important factor to consider, Defendant did not cause a materially adverse change in Plaintiff's terms and conditions of employment.

In a factually similar case, the plaintiff requested a schedule change in order to care for her autistic daughter. *Blake v. Potter*, No. 1:04 CV 2112, 1:05 CV 649, 2006 WL 355321 (N.D. Ohio Feb. 15, 2006). Her request was denied and she filed a discrimination claim. *Id.* at *9. The court found the denial of a shift change was not an adverse employment action because it did not affect the terms and conditions of her employment, but instead preserved them as contemplated by the applicable collective bargaining agreement and bidding process. *Id.* at *10. The court also noted that the denial of a shift change may require the plaintiff to use annual and sick leave days, but this denial does not equate to an adverse employment action. *Id.* at *11. See also *Bascos v. Henderson*, No. 97 C 4329, 1999 WL 350841 at *6 (N.D. Ill. May 14, 1999) (the denial of a shift change request made for medical and childcare reasons "is a far cry from incidents such as demotions, cuts in pay, or reductions in responsibility. There was no effect on his seniority, pay, benefits, or responsibility. Whether [the plaintiff] works during the day or night is a matter of convenience. It is not materially adverse . . .").

In the present case, accommodations were similarly discretionary. Hardship accommodations for everyone were eliminated after Plaintiff's ended, and the denial did not affect her pay, responsibilities, seniority, or benefits. Furthermore, the Court agrees that the use of sick days because a voluntary request was denied does not establish an adverse employment action.

Neither is the denial of training during work hours an adverse employment action. Plaintiff alleges she was required to take training during her own time, thereby causing her to use sick days to attend training. Here again, Plaintiff fails to explain how the denial of optional training caused a material change in her terms or conditions of employment. The training was not mandatory or necessary for her position, and the training was available to her if she attended on her own time. Plaintiff alleges that attending on her own time required the use of a sick day, which caused a loss of wages. However, Defendant did not force Plaintiff's use of sick days; she voluntarily requested the training and she could have swapped shifts with another police officer, rather than use a sick day.[4] Additionally, "decisions to deny or grant training . . . clearly fall within the realm of the employer's business judgment." *Vitt v. City of Cincinnati*, 97 Fed. Appx. 634, 639-40 (6th Cir. 2004) (finding failure to allow employee to attend training and seminars is not an adverse employment action). Defendant did not force Plaintiff to lose wages and therefore the denial of training is not an adverse employment action.

Plaintiff next alleges Captain Mason submitted negative evaluations of her because she was a female. Plaintiff argues that evaluations that directly disentitle an employee to a raise are adverse employment actions. However, if a low evaluation does not affect an employee's raise or promotion, it is a *de minimis* employment action. *Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999) (no adverse employment action when plaintiff failed to show the low evaluation had an effect on her wages). *De minimus* employment actions are not actionable under Title VII. *Bowman v. Shawnee State*

---

[4] The training program ran during the day shift and Plaintiff worked the midnight shift. For Plaintiff to attend training she would work a full midnight shift and then go directly to training, afterwhich she would have the evening off and be back on the midnight shift. This essentially creates a double shift. The solution was for Plaintiff to swap shifts with another officer and work the day shift the day before the training.

*Univ.*, 220 F.3d 456, 462 (6th Cir. 2000). Here, Plaintiff received a bad evaluation from Captain Mason, but it did not affect her application to the Domestic Violence Unit (even with the bad evaluation from Mason she received full points in the "supervisor evaluation" category). Its effect, therefore, was *de minimis* and not an adverse action.

Finally, Plaintiff cites *Stover v. Martinez*, 382 F.3d 1064, 1075 (10th Cir. 2004), to support her argument that the alleged incidents of harassment, while individually insufficient, taken together are sufficiently severe to establish an adverse employment action. In *Stover*, however, the court addressed a retaliation claim, not a discrimination claim. *Id.* Discrimination claims specifically require a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Harassment may be actionable in Title VII quid pro quo, hostile work environment, and retaliation claims, even if terms and conditions of employment are unaffected, but Plaintiff has not brought such a claim (Plaintiff's retaliation claims will be discussed below). To support the discrimination claim, Plaintiff must show a change in terms and conditions of her employment. Plaintiff fails to show how the incidents of harassment, individually or as a whole, have changed her terms or conditions of employment and therefore these actions did not create an adverse employment action in a Title VII discrimination claim.

## **ASSOCIATIONAL DISABILITY**

In Count Three, Defendant allegedly denied Plaintiff a shift change on the basis of her association with her disabled daughter. Plaintiff believes such an action is unlawful under Ohio Rev. Code § 4112.02(A). While Section 4112.02(A) contains no provision for "associational diabilities," Plaintiff maintains that Chapter 4112 was meant to mirror the federal Americans with Disabilities Act

9

(ADA), which does recognize the claim. While Ohio courts use interpretations of the ADA to help interpret Ohio law, the two are not identical, merely similar. *Smith v. Hinkle Manufacturing, Inc.*, 36 Fed. Appx. 825, 830-31 (6th Cir. 2002). The Ohio statute contains no similar provision for "associational disabilities" and, therefore, the Court holds there is no such claim under state law.

## RETALIATION

In Count Four, Plaintiff alleges Defendant harassed and retaliated against her because of her gender, a violation of Ohio Rev. Code § 4112.02(A).[5] Retaliation claims brought under Ohio Rev. Code § 4112 are analyzed under the same framework as Title VII claims. *Little Forest Medical Ctr. of Akron v. Ohio Civil Rights Comm.*, 61 Ohio St. 3d 607, 609-10 (1991). To establish a prima facie case of retaliation, Plaintiff must show that: (1) she engaged in activity protected under Ohio Rev. Code § 4112; (2) Defendant knew that she engaged in the protected activity; (3) Defendant subsequently took an adverse, retaliatory action against her; and (4) the protected activity and the adverse action were causally connected. *Randolph v. Ohio Dept. of Youth Services*, 453 F.3d 724, 736 (6th Cir. 2006).

Plaintiff satisfies the first two requirements of a prima facie case: the fact that the EEOC claim is a protected action, and that Defendant knew she filed an EEOC claim is undisputed. To establish the third element, Plaintiff alleges Defendant took four adverse actions against her after she filed an EEOC claim on April 1, 2004. The four retaliatory actions are: (1) refusing Plaintiff access to the Police Chief; (2) Captain Mason's negative evaluation; (3) placing obstacles upon her request to change her key schedule; and (4) denying Plaintiff training opportunities. The Court finds none of these actions are adverse actions as defined in the context of a Title VII retaliation claim.

---

[5] While Defendant's briefs addressed both a possible hostile work environment claim and retaliation claim arising out of Count Four, it is clear that Plaintiff failed to plead a hostile work environment claim (Complaint Doc. No. 1).

Defendant takes an adverse retaliatory action when a "reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Sante Fe R. Co. v. White*, 126 S. Ct. 2405, 2415 (2006). An individual is not protected from all retaliation, but only "from retaliation that causes injury or harm." *Id.* at 2414. When evaluating an alleged adverse retaliatory action, the Court should evaluate the action's harm objectively, and consider the action in light of the particular circumstances of the case, as some acts would be material in one case but immaterial in another. *See id.* at 2415-16; *Jordan v. City of Cleveland*, 464 F.3d 584, 594-95 (6th Cir. 2006). "By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *White*, 126 S. Ct. at 2416.

Plaintiff argues the four alleged actions were calculated to frustrate her attempts to progress in her job while maintaining care of her daughter. First, Plaintiff alleges Defendant denied her access to the Chief when she attempted to contact him regarding the extension of her hardship accommodation. Plaintiff had already been denied a hardship extension when she left phone messages with the Chief's secretary, essentially trying to bypass the chain of command. At one point, Lieutenant Robert Henry harshly told her to "stop bugging the Chief" and that the Chief had already addressed the situation (Baker Dep. 98-99). Harsh statements are not enough to create an adverse retaliatory action. There is nothing to suggest that Lieutenant Henry's comments were so unbearable or threatening that a reasonable employee would have been dissuaded from complaining about discrimination. Petty slights and insults do not constitute adverse actions, and Lieutenant Henry's remarks were, at worst, rude or

11

"uncivil." *White*, at 126 S. Ct. at 2415 ("Title VII . . . does not set forth 'a general civility code for the American workplace'").

This Court already determined that Captain Mason's evaluation of Plaintiff's suitability for a Domestic Violence Unit position was, for the purpose of Plaintiff's gender discrimination claim, a *de minimus* action and not an adverse employment action. Similarly, actions causing trivial harm are insufficient to sustain a Title VII retaliation claim. *Id.* at 2407 ("The Court refers to material adversity to separate significant from trivial harms."). The Court finds that the evaluation, which had no effect on Plaintiff's employment or application for a position with the Domestic Violence Unit, caused Plaintiff little or no actual harm and is not an adverse retaliatory action.

Plaintiff's third alleged retaliatory action is that Defendant, through Captain Mason, placed obstacles in the way of her key change request. However, she was eventually granted a key change request after she and her husband submitted their request in writing. Captain Mason testified he asked for the request in writing because the joint request was unusual and he wanted to make sure they really wanted the change (Mason Dep. 79-82). Plaintiff fails to identify any harm as a result of the slight delay, or how the delay would discourage a reasonable employee from filing a discrimination complaint. Therefore, asking for the key change request to be in writing caused, at best, only trivial harm and is not an adverse retaliatory action.

Plaintiff's final alleged adverse retaliatory action is the denial of training opportunities. While Plaintiff cites to two denials of training opportunities, in only the first denial, for the "Grant Writing Workshop," was she denied admittance. She was denied because she did not acquire the proper approval before sending her application to the Academy. The second claimed denial, for "Emotional Survival" training, was not a true denial; rather, she was allowed to attend but on her own time.

12

The Court previously addressed this issue in the context of Plaintiff's discrimination claim and found that requiring non-mandatory training to be taken on personal time, and the denial of training for failure to follow proper procedure, are not adverse employment actions because they did not materially affect the terms and conditions of her employment. The definition of adverse actions in retaliation claims is broader than the definition used in discrimination claims (*White*, 126 S.Ct. at 2414). Even under the broader definition, the denial of training in these situations is not an adverse action because Plaintiff fails to show how she was harmed or how a reasonable employee would have been discouraged from bringing a discrimination claim. Furthermore, Plaintiff was not the only patrol officer under Captain Mason's command to be approved for "Emotional Survival" training only if they attended on their own time, nor was she the only one denied approval by the Academy for failure to get the proper approval from a commander (Mason Dep. Exs. M2, N2). It is unlikely that a reasonable employee would be discouraged from bringing a discrimination claim because of these actions.

Because Plaintiff fails to identify an adverse retaliatory action taken against her, she fails to establish the third element of a prima facie case of retaliation.

### HARASSMENT

Finally, in Count Four of the Complaint, Plaintiff ambiguously alleges Defendant "engaged in harassment and retaliation" against her, and later fails to elaborate upon her claim in her Memorandum in Opposition (Doc. No. 35). As previously addressed by the Court, Plaintiff claims the acts of harassment, when considered all together, constituted an adverse employment action in a *discrimination* claim. Plaintiff does not articulate a *retaliation* claim based on harassment and, even if she had, Plaintiff would fail to establish a prima facie case of retaliation.

13

The Sixth Circuit recognizes that Plaintiff may show an adverse retaliatory action or "severe or pervasive retaliatory harassment by a supervisor" to establish the third element of a prima facie case of retaliation. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). This retaliatory harassment must be more than "simple teasing, offhand comments, and isolated incidents." *Id.* at 793. Plaintiff's alleged harassment occurring after her April 1, 2004 EEOC filing includes the alleged retaliatory actions already discussed, as well as a denial of another training session and a traffic citation for a minor traffic accident in her own personal vehicle when she was not at fault (Baker Dep. Ex. L). These actions do not establish severe or pervasive retaliatory harassment by a supervisor.

In a recent case, the Sixth Circuit found severe or pervasive retaliatory harassment when a senior firefighter was made to do menial and dirty chores usually reserved for junior firefighters, was denied "acting time," was detailed to stations where he was the junior or only black firefighter, was belittled and branded as "difficult," had his gear stuffed into a basketball hoop and torn, and faced confrontation and threats not to take his complaints to superiors. *Jordan*, 464 F.3d at 598-99; *see also Morris*, 201 F.3d at 793 (retaliatory harassment occurred when her supervisor stopped by her building fifteen times and called the plaintiff thirty times just to harass her, sat outside her window and made faces at her on several occasions, followed her home from work and gave her "the finger," destroyed a TV in her workplace, and threw roofing nails onto her driveway).

Requiring training to be taken on personal time, requiring a key change request in writing, denying access to the Chief, a negative evaluation, and a traffic citation, all over approximately one year, do not rise to the level of "severe or pervasive" harassment. Conduct must be extreme to constitute severe and pervasive retaliatory harassment. *Ceckitti v. City of Columbus, Dept. of Public Safety, Div. of Police*, 14 Fed. Appx. 512, 518 (6th Cir. 2001). The actions alleged by Plaintiff do not

14

rise to the level of actions in *Jordan* and *Morris*, and while they may be more than "offhand comments" or "simple teasing," they are relatively mild in nature. *See Akers v. Alvey*, 338 F.3d 491, 499 (6th Cir. 2003) (ignoring plaintiff, encouraging others to ignore plaintiff, criticizing her work, and withholding her mail is not severe or pervasive retaliatory harassment). Furthermore, there is no evidence these actions were related to her EEOC complaint. Even if Plaintiff intended to bring a retaliatory harassment claim, she fails to establish a prima facie case.

## CONCLUSION

Plaintiff fails to establish that Defendant took an adverse employment action against Plaintiff, an essential element for gender discrimination claims under Title VII and Ohio Rev. Code § 4112.02(A) and for retaliation claims under Title VII. Plaintiff also fails to identify Ohio law making claims for "associational disability" discrimination actionable. In the absence of disputed material facts, summary judgment in favor of Defendant is appropriate.

IT IS SO ORDERED.

                                                                s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

April 11, 2007